ESSEX COUNTY ORPHANS COURT.

In the matter of the estate of GEORGE DILLON, deceased.

**Wills—Probate—Question When Will was Executed—Both Witnesses that the Entire Transaction was Completed in Room in which it Begun, the Only Question Being in which Room it was—Alleged Lack of Testamentary Capacity Considered and no Evidence Found to Support the Charge—Alleged Undue Influence Considered and Found Unfounded.**

On appeal from probate.

*Mr. Milton M. Unger,* proctor for the appellant.

*Mr. Irving W. Teeple,* proctor for the defendants.

*Mr. J. Bradley Scott* (of the New York bar), proctor for a legatee.

KOCHER, ADVISORY MASTER.

The last will and testament of George Dillon, late of the county of Essex, who died on the 24th day of November, 1924, was duly admitted to probate by the surrogate of the said county on the 5th day of December, 1924. In and by said will, after making two bequests of $500 each, testator gives and bequeaths all the rest, residue and remainder of his estate to his sisters, Margaret Tipton, Mary Palmer, Ella Mantz and Julia Dillon, appointing his attorney, Roy F. Dunn, the sole executor thereof. Testator left him surviving a widow, but no children, or the descendants of any deceased children. A petition of appeal from the order of the surrogate admitting the said will to probate was filed by Carrie F. Dillon, the widow of the testator.

The first point made by appellant is that the will was not executed according to law.

The will was drawn by Roy F. Dunn, testator's attorney, for a period covering at least several years, and was witnessed

by the said Roy F. Dunn and one Edward Goerke, Jr., who witnessed the will at the request of Mr. Dunn. At the time of the execution of the will the testator was in St. Barnabas' Hospital, and Mr. Dunn testified that when he arrived at the hospital, with Mr. Goerke, he found the testator in his own room, and that, to the best of his recollection, they were cleaning the room, or doing something to it, and the testator took Dunn and Goerke, the two witnesses, to another room. Dunn testifies unequivocally to all of the facts necessary to constitute the valid execution of the will. Mr. Goerke also testified to all of the facts required by law to constitute the execution of a valid will. He, however, stated that to the best of his recollection the will was executed in the testator's own room, and that they did not leave that room during the execution of the will, so that the only conflict in the testimony is as to whether the will was executed in one or another room.

The will contains a perfect attestation clause, and it is well settled that on proof of the authenticity of the signatures of the subscribing witnesses the facts stated in the attestation clause must be accepted as true until it is shown by affirmative proof that they are not. *Farley* v. *Farley, 50 N. J. Eq. 434.* It is further settled that if the attestation clause is perfect, and one of the attesting witnesses corroborates its accuracy, the testimony of the other attesting witness suggesting doubt or his want of recollection will not justify denial of probate. *McCurdy* v. *Neall, 42 N. J. Eq. 333.*

In the case under consideration both witnesses testified that the entire transaction was completed in the same room in which it was begun; that neither person left the room during the execution of the will; the only difference being as to in which of two rooms the will was actually executed. It is perfectly apparent that this will not invalidate the execution of the will, for whichever witness is correct, his testimony supporting the attestation clause is sufficient to constitute a valid execution.

Another point raised is the lack of testamentary capacity of the testator. It will be necessary in this connection to examine rather minutely into the history of the testator's physical condition.

50

Dr. Theodore Teimer testified that on July 16th, 1923, the testator called at his office, and that he made a thorough examination of him. He found that he had lost one leg and was suffering from diabetes and tuberculosis of the lungs, and he advised him to go to the Presbyterian Hospital, where he could have better treatment than at home. He remained in the hospital two weeks, and gained ten pounds, and was greatly improved in health. Testator kept coming to the doctor's office from time to time to the end of October of the same year. When asked if he had observed the mental condition of the testator during that period, the doctor replied: "Yes, of course. Q. Now, how did he act? A. Well, he did not act anyway abnormal. He acted perfectly normal, like anyone would be."

In October, 1923, the testator, with his wife, went to Florida, and after his return, on April 26th, 1924, he consulted Dr. Clarence Bumstead, who testified that Mr. Dillon first consulted him in the early part of May, 1924, and that he found that he was suffering from an advanced case of tuberculosis and diabetes, and suggested that he go to St. Barnabas' Hospital for treatment, which he did; that he remained at St. Barnabas' Hospital for seven weeks, where he saw the testator every day; that the tuberculosis became worse, and that in the middle or latter part of June, 1924, he suggested that the testator be removed to the Verona, Essex county, Sanitarium, which was done. Dr. Bumstead, upon being asked as to what testator's mental condition was, replied that it was that of a perfectly normal man. He further stated that he was so normal that he never gave his mental condition a thought. Upon cross-examination the doctor added that, as he had said before, he directed no more special attention to Mr. Dillon's mental condition than he had to that of the cross-examiner.

On June 20th, 1924, the testator was admitted to the Verona, Essex county, Sanitarium, and Dr. Bennett, of that institution, stated he found, after an examination of him, that he had pulmonary tuberculosis, an advanced case, and he also had a complication of diabetes at the time; that he

saw him practically every day during his stay at Verona. Asked in regard to his mental condition, he said, "I did not notice anything that was not all right." Asked if he appeared to be normal, he replied, "Yes, normal condition." Testator left Verona on September 25th, 1924, and again consulted Dr. Teimer, who testified that he found that he was in a run-down condition, the diabetes had become very bad and his tuberculosis had made great headway, and advised him to enter the city hospital, which he did, and on September 26th, 1924, Dr. Teimer further testified that he attended him up to the end of his illness; that he was a very quiet and intelligent observer of everything that was going on, and that his mental condition was always perfect, indeed. When asked, upon cross-examination, what the mental condition of testator was before he went south, the doctor replied: "Well, intellectually, it was very good. He was a good, keen observer." Lydia Dieffenbach, a nurse connected with St. Barnabas' Hospital, testified that she recalled Mr. Dillon, and that she attended him from May 3d to May 7th, 1923, and when asked what she noticed about him, replied that "he was aloof; he was suspicious of everybody; he made no friends between patients, or nurses, or doctors, and kept to himself." Asked if she observed any peculiarities in any direction, she replied, "None, except that he just acted queerly; he would walk up and down the corridor in May with his overcoat on. That was the most pronounced peculiarity."

In a recent case it was held that "the standard of testamentary capacity has been properly fixed at a very low point in the scale of intelligence. The right of a testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition, so long as he has intelligence to exert it, has been, by the courts of this state at least, inflexibly maintained. It is right that it should be so." *In re Shimer's Will, 103 Atl. Rep. 383.* This principle is so thoroughly sustained by a multitude of decisions of our courts that it is unnecessary to cite further authorities.

It will be observed that the testimony as to testator's testamentary capacity starts from July 16th, 1923, almost one

year prior to the execution of the will, and continues to the time of his death, and that there is nothing to even suggest an abnormal condition, except the testimony of the nurse in St. Barnabas' Hospital, who said that she thought he was queer because he did not mingle with the other patients and wore an overcoat during the month of May in the corridors of the hospital. There was also introduced into evidence by the appellant a number of letters, written by the testator to Mrs. Dillon from the Verona Sanitarium during the period of Mrs. Dillon's absence on a visit. These letters are straightforward and show the operation of an intelligent mind.

At the conclusion of this testimony I felt that there could be absolutely no question as to the testator's having full mental capacity, and when counsel for the appellant requested a further adjournment for the purpose of producing the testimony of Dr. Dunham, the superintendent of the Verona, Essex county, Sanitarium, the application was denied, for the reason that, in the first place, his testimony could not shake the abundant testimony of the various physicians as to his mental condition, and, furthermore, that he, being the superintendent of the institution, would know infinitely less about the patient's condition than would the attending physician, who saw the patient day by day, and whose testimony was taken.

The remaining point to be considered is whether the will was the product of undue influence, exercised, it is claimed, during the course of the hearing, by testator's sisters, and upon appellant's brief by Roy F. Dunn, who drew the will.

Mr. Dunn testified that he became acquainted with the testator in 1917, and later became an intimate acquaintance, which continued to the time of his death; that on May 5th, 1923, Mr. Dillon called him on the telephone from St. Barnabas' Hospital and requested him to come to the hospital to prepare a will; he went to the hospital on the same day, and obtained the data for the will from Mr. Dillon, and on the 6th of May, he having, in the meantime, had the draft of the will reduced to typewriting, went to the hospital with his friend Goerke, where the will was executed.

He also stated that he had prepared an earlier will for Mr. Dillon, dated January 11th, 1923, in which will one-fifth of the residuary estate was given to testator's wife and the remainder divided among his sisters, which will was introduced in evidence; that at the time he prepared the last will, from which Mrs. Dillon was excluded, he asked Mr. Dillon whether or not he did not wish to include his wife in the will, and he stated that he did not, and the will was drawn in accordance with his wishes, excluding the wife from participation therein. He further testified that he visited Mr. Dillon from time to time at the various hospitals where he was confined, with the exception of Verona, but at no time subsequent to the execution of the last will of May 6th, 1924, was there any conversation between them with regard to the will. Asked whether Mr. Dillon had told him of any reason why he was excluding his wife, Dunn replied that Mr. Dillon had been constantly complaining of the conduct of his wife toward him; that she treated him unkindly and did not care for him as she should. In fact, he testified that during his entire acquaintance with Mr. Dillon he had been complaining of the conduct of his wife toward him, and at one time conferred with him as to procuring a separation from her.

There can be no doubt that at least up to the time when the Dillons went to Florida the relations between them were strained. Mrs. Dillon testified that one reason for these strained relations was that her husband was infatuated with another woman and continued to be so down to the very end. She also testified that in 1922, after a controversy between herself and Mr. Dillon, he destroyed a will which was favorable to her. Another source of friction occurred in August, 1923, when Mr. Dillon was about to sell certain real estate which he owned and requested that his wife join in the deed with him. She refused to do so unless she received one-half of the proceeds of the sale, which she, in fact, did receive. In extenuation of this act upon her part, she stated that she gave to her husband the money with which he got his start, and that without her money he would never have gotten anywhere, or words to that effect. She stated that she had

received a legacy of $5,000, and that it was from the money so received that she obtained the money to give her husband a start, as she called it. There is no proof as to the amount of money she gave him, and her testimony to this effect stands unsupported. Mrs. Dillon further testified that subsequent to this transaction, which occurred in the office of Mr. Dunn, who was acting for her husband, that Mr. Dunn became hostile to her. Asked as to how that hostility was evidenced, she replied that he was not as cordial as he had been before, but that is as far as the testimony goes in regard to the hostility between Dunn and Mrs. Dillon, and it is to be here observed that Mr. Dunn received no benefit under the will except his appointment as executor, and, in view of the fact that he had been the attorney of Mr. Dillon for several years, and of the further fact that he had drawn testator's previous will, wherein he had also been named as executor, it was quite natural for the testator to turn to him in seeking an executor.

As to any connection or relations of any character between Mr. Dunn and the favored beneficiaries under the will, none appears in the testimony, and the testimony is barren of any evidence tending to show any attempt on their part to exercise any influence upon the testator.

There is one inexplicable feature in this case. Reference has heretofore been made to letters in evidence which had been sent by Mr. Dillon to his wife during the time that he was at Verona. These letters, as has already been stated, were intelligent and disclosed an apparent affection on the part of Mr. Dillon for his wife. We have, too, the conduct of Mrs. Dillon while Mr. Dillon was at the city hospital. She testified that she attended him constantly there, took him delicacies of one kind and another, and other witnesses testified that he thought very kindly of her, and that when she did not call upon him at the times when he expected her that he displayed impatience at her not coming, and expressed his desire to see her. On the other hand, Dunn testified that while all of this was going on testator was complaining to him of his wife's actions toward him. The only solution of

this problem is that testator was unable to, forget his past grievances against his wife while accepting and welcoming her present attentions.

It is well settled that the influence, which the law denominates as undue, must be such as to destroy the free agency of the testator and amount to moral or physical coercion. It must be proved, moreover, that the act done was the result of such coercion. There must be a control exercised over the mind of the testator or an importunity practiced which he could not resist or to which he yielded for the sake of peace. *Fritz* v. *Turner, 46 N. J. Eq. 515* (at *p. 517*) ; reversed, *49 N. J. Eq. 343,* on the ground that the parties did not have a full and proper hearing in the court below. There are many other cases supporting this principle. The case above cited, however, appears to state the principle more fully and completely than any other case.

Testator, apparently, during the last few years of his life, had the fixed testamentary determination that his sisters should share largely in his estate. It will be remembered that in the will of January 11th, 1923, he gave his wife only one-fifth of his property, dividing the rest among his sisters, and the testimony is barren of any hint that his sisters attempted in anywise to influence him in regard to the manner in which he should dispose of his property. As a matter of fact, the wife was unfriendly with his sisters, who testified that the reason for the unfriendly relations existing between them was the manner in which Mrs. Dillon behaved towards her husband. There can be no doubt that hostile relations existed between husband and wife as late as August, 1923, when she pursued the very unwifely conduct of refusing to join in the deeds conveying his property unless she received one-half of the proceeds. Later on, in October of the same year, they went to Florida. As to her conduct toward her husband while in Florida, we have no evidence except her own and that of Elias Van Horn, who visited them four times while in Florida, and who testified that most cordial relations existed between them. It may be that the solution of the whole difficulty in regard to the change in her conduct towards him, which occurred after his return from

Florida in a weakened and feeble condition, was due to the fact that appellant, realizing his condition, and that he had not long to live, sought to ingratiate herself into his affections in the hope that he might forget what had gone by, and make a will in her favor; in fact, in one of the letters which he wrote to her while at Verona he used words to the effect that he thought that their past differences had been perhaps fifty-fifty, and that the past should be forgotten. It may also be that he intended to make a new will, as is suggested by some of the testimony, favoring his wife. The fact is that he did not.

Applying the rule laid down in *Fritz* v. *Turner, supra*, it must be perfectly apparent that the case is barren of any testimony even tending to show undue influence on the part of either Mr. Dunn or testator's sisters. While it may be contended that confidential relations existed between Mr. Dunn and the testator, he not being the favored beneficiary under the will, and there being nothing to connect him with the interests of the favored beneficiaries, the doctrine laid down in *Spark's Case, 63 N. J. Eq. 242*, cannot be invoked. *4 Comp. Stat. p. 5862 § 4*, provides that if any person taking any interest under a will witnesses it, that he shall forfeit his legacy, and it is settled law that the fact that a witness to a will is also named therein as executor, does not confer upon him such an interest under the will as to deprive him of the right to qualify as executor of said will. It must therefore follow that the fact that Dunn was named as executor in the will does not confer upon him the standing of a favored legatee in the sense in which that phrase is used in *Spark's Case, supra*.

At the conclusion of the testimony proctor for appellant requested an adjournment for the purpose of producing witnesses to prove the exercise of undue influence upon the testator, but admitted that he was not familiar with what his witnesses would testify to. An adjournment was therefore taken to enable him to interview his witnesses. A few days later he informed me that he did not wish to call any other witnesses.

I will advise an order dismissing the appeal.